RATTET, PASTERNAK & GORDON OLIVER, LLP
Attorneys for Appellant
550 Mamaroneck Avenue
Harrison, New York 10528
(914) 381-7400

JONATHAN S. PASTERNAK (6107)
DAWN K. ARNOLD (0642)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:                                                      Bankruptcy Appeal

ST. CASIMIR DEVELOPMENT CORP.,          07 Civ. 2908 (CM)

                              Debtor.
-------------------------------------------------------------X


## APPELLANT'S BRIEF

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ iii

STATEMENT OF BASIS FOR APPELLATE JURISDICTION......1

STANDARD OF REVIEW ............................................................1

STATEMENT OF ISSUES ON APPEAL......................................1

STATEMENT OF THE CASE AND STATEMENT OF FACTS ....3

A.   BACKGROUND FACTS ......................................................3

B.   ST. CASIMIR SENIOR HOUSING APARTMENTS..............3

C.   BUILDING AND FINANCING THE RESIDENCE .................5

D.   THE PARTNERSHIP AGREEMENT....................................6

E.    OCCUPANCY OF THE RESIDENCE .................................7

F.   SERVICE OF NOTICE OF ALLEGED "MAJOR DEFAULTS"9

G.   STATEMENT OF THE CASE AND PRIOR PROCEEDINGS
      11

ARGUMENT ..............................................................................12

POINT I.....................................................................................12

THE BANKRUPTCY COURT IMPROPERLY ............................12
DENIED THE DEBTOR ANY OPPORTUNITY TO ....................12
ASSUME THE PARTNERSHIP AGREEMENT..........................12

POINT II....................................................................................21

THE DEBTOR CAN FREELY ASSUME AND ASSIGN .............21
ITS PARTNERSHIP INTEREST .................................................21

POINT III...................................................................................32

THE COURT APPLIED IMPROPER STANDARDS....................32
IN DECIDING TO LIFT STAY ....................................................32
CONCLUSION...........................................................................36

# <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Bell v. Alden Owners, Inc.</u> 199 B.R. 451, 454 (S.D.N.Y. 1996) .............................1

<u>Coleman Oil Co. v. Circle K Corp. (In re Circle K Corp.)</u>, 127 F. 3d 904,910-l 1
    (9th Cir. 1997) ................................................................................29, 30, 31

<u>In re Adelphia Communications Corp.,</u>  359 B.R. 65 (Bkrtcy. S.D.N.Y.,2007)
    .................................................................................................... passim

<u>In re Cardinal Industries, Inc.</u>  116 B.R. 964, 982 (Bkrtcy. S.D.Ohio,1990)...32, 33

<u>In re Jamesway Corp.</u>, 201 B. R. 73 (Bankr. S.D.N.Y. 1996)..................29, 31, 32

<u>In re Pudgie's Development of NY, Inc.,</u> 239 B.R. 688, 691 (S.D.N.Y. 1999) .......1

<u>In re Schick</u>  235 B.R. 318 (Bkrtcy.S.D.N.Y.,1999) .................................... passim

<u>In re St. Casimir Development Corp.,</u> 358 B.R. 24 (S.D.N.Y. 2007) ....................1

<u>In re Tobago Bay Trading Co.,</u> 112 B. R. 463 (Bankr. N. D. Ga. 1990) ..............29

<u>Matter of Cohoes Indus. Terminal, Inc.,</u>  931 F.2d 222 (2d Cir.,1991) ..........33, 34

<u>Moody v. Amoco Oil Co.</u>, 734 F.2d 1200, 1212-1213 (7th Cir. 1984) ..................14

<u>South Coast Plaza v. Standor Jewelers W., Inc. (In re Standor Jewelers W., Inc.),</u>
    129 B. R. 200,203 (B. A. P. 9th Cir. 1991) .................................................29, 31

<u>Telesphere Liquidating Trust v. Galesi</u>, 246 B.R. 315 (N.D. Ill.,E.D. 2000)...........1

<u>The North River Insurance Company v. Philadelphia Reinsurance Corporation,</u>
    63 F.3d 160, 164, 165 (2d Cir. 1995) .............................................................15

<u>United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.</u>  484
    U.S. 365, 376, 108 S.Ct. 626, 633 (U.S. 1988) .........................................29, 35

**Statutes**

28 U.S.C. §158 ............................................................................................... 1

11 U.S.C. § 362................................................................................ 2, 17, 34, 35

**Rules**

Fed.R.Bankr.P. Rule 8013............................................................................... 1

## STATEMENT OF BASIS FOR APPELLATE JURISDICTION

The United States District Court has jurisdiction to hear an appeal from a decision of the United States Bankruptcy Court pursuant to 28 U.S.C. §158. <u>Bell v. Alden Owners, Inc.</u> 199 B.R. 451, 454 (S.D.N.Y. 1996).

## STANDARD OF REVIEW

**Error! Bookmark not defined.**Fed.R.Bankr.P. Rule 8013**Error! Bookmark not defined.Error! Bookmark not defined.** governs the review of Bankruptcy Court determinations by the District Court. "On appeal, a bankruptcy court's conclusions of law are reviewed de novo." <u>In re Pudgie's Development of NY, Inc.</u>, 239 B.R. 688, 691 (S.D.N.Y. 1999). The Court's determination as to the legal effect of notice provisions in a contract, where the facts relating to service of notice, is clearly a legal determination, and subject to review de novo. See, e.g. <u>Telesphere Liquidating Trust v. Galesi</u>, 246 B.R. 315 (N.D. Ill.,E.D. 2000) ("On appeal, a bankruptcy court's conclusions of law are reviewed de novo.")

## STATEMENT OF ISSUES ON APPEAL

1)    Did the Court err by entering the Final Order Signed on: 2/28/2007 Re: Findings Of Fact And Order Granting Relief From The Automatic Stay And Related Injunctive Relief? (EOD Date: 3/1/2007. Doc. No: 88, Main Case)?

2)    Did the Court err by ignoring applicable standards governing assumption or rejection of executory contracts in bankruptcy proceedings?

3)    Did the Court err by ignoring applicable standards, pursuant to 11 U.S.C. §365, by failing to grant the Debtor any opportunity whatsoever, under the dictates of the decision of the District Court in <u>In re St. Casimir Development Corp.</u>, 358 B.R. 24

(S.D.N.Y. 2007), to assume or reject its executory contract with Appellee?

4)      Did the Court err by ignoring the distinction between standards for lifting the automatic stay pursuant to 11 U.S.C. §362 and the standards for limiting time for assumption or rejection of executory contracts pursuant to 11 U.S.C. §365?

5)      Did the Court err by determining that the economic interests of a general partner in a limited partnership cannot be assigned pursuant to 11 U.S.C. §365 and New York Partnership Law §121-702?

6)      Did the Bankruptcy Court err by finding that the Debtor was not capable of reorganization within a reasonable amount of time?

The Appellant would answer these questions in the affirmative.

The Bankruptcy Judge (Adlai S. Hardin Jr.) lifted the automatic stay for "cause" based upon an improper application of 11 U.S.C. §362. The Court essentially based its decision on the magnitude of Alliant's prior financial investment in St. Casimir. The Court, sub silentio, overruled a decision of the United States District Court, Southern District of New York (the "District Court") in a prior successful appeal by Appellant, In re St. Casimir Development Corp., 358 B.R. 24 (S.D.N.Y. 2007) (the "District Court Reported Decision"), in which the District Court held that the Debtor had an interest in St. Casimir, subject to assumption or rejection. The Bankruptcy Court, in the ruling under appeal, upended the holding of the District Court Reported Decision that: held despite the purported contractual expiration of the "cure period" under the Amended and Restated Agreement of Limited Partnership (the "Partnership Agreement", CD-A-2, Exhibit "A"), the Debtor, as General Partner, was authorized by 11 U.S.C. §365 to cure its default and assume the Partnership Agreement, (CD-A-2), Exhibit "A".

## STATEMENT OF THE CASE AND STATEMENT OF FACTS

### A.    BACKGROUND FACTS[1]

The Debtor-in-Possession, St. Casimir Development Corp., ("Debtor" or "Appellant"), Appellant herein,  is a general partner of 11-23 St. Casimir Avenue, L.P. ("St. Casimir"), a landmark building and senior citizen residence in Yonkers, New York. Appellant holds a 1% interest in St. Casimir, with a future entitlement to a 100% interest. (D-2a)[2]

### B.    ST. CASIMIR SENIOR HOUSING APARTMENTS

Appellant, on behalf of St. Casimir, through its diligent efforts and management, rescued, refurbished and preserved (by placing on the historical registry), a landmark in Yonkers, New York.  The result is "St. Casimir Senior Housing Apartments", a 107 unit, independent living, low-income, senior residence at 11-23 St. Casimir Avenue, Yonkers, New York 10701 ("Residence"). In addition to the 107 residential units, the Residence also has 7,500 sq. ft. of commercial space on the concourse level which has been 100% leased since June 2005.  The commercial space is leased to tenants who provide various services geared towards the needs of the seniors in the Residence and the

---

[1] Unless otherwise cited, for purposes of the Statement of Facts, all references to factual statements are contained in the Affidavit of Gary Flocco in Opposition to Motion by Alliant Tax Credit XIV, Inc. and Alliant Tax Credit fund, XIV, Ltd for Relief from the Automatic Stay Pursuant to 11 U.S.C. Section 362(d) and for Injunctive Relief Pursuant to 11 U.S.C. Section 105(a) sworn to January 13, 2006 (the "January 13, 2006 Flocco Affidavit" and associated exhibits) (D-4). Other factual statements, which will be cited specifically, are contained in the Declaration of Brian Doran in Support of Motion for Relief from the Automatic Stay dated December 21, 2005 (the "December 21, 2005 Doran Declaration" and associated exhibits) (D-3) and exhibits to Appellant's Supplemental Memorandum of Law dated February 16, 2006 (the "Supplemental Memorandum of Law Exhibits") (D-16).

[2] As per the Partnership Agreement, Alliant's interest in the Residence phases out in 2013 when its right to use the tax credits associated with the Residence run out.  The Yonkers IDA's interest in the property ceases after the mortgage is paid (2040 if not paid earlier), when St. Casimir has the right to purchase for one dollar ($1.00) (D-2a).

community at large.

The seniors in the Residence receive rent subsidies, commonly referred to as "Section 8". Thus, St. Casimir derives its revenue through its rent roll as well as rent subsidies that it receives from Section 8 funds. Construction of the project was substantially funded through the issuance of Bonds by the Yonkers IDA. In addition, Mr. Gary Flocco and Mr. Mondello, Appellant's shareholders, have *personally* invested over four million dollars ($4,000,000) in the project. These personal funds have been used to (i) pay back-taxes owed to the City of Yonkers prior to acquisition of the property ($1.5 million), (ii) all predevelopment costs including but not limited to zoning and planning approvals, architectural drawings and all third party reports, submissions and applications; (iii) acquisition and demolition costs, and (iv) fund final project costs (misc. contractor fees, etc.) that were required to be paid before approval of the Residence by HUD for occupancy. In addition, Mr. Flocco is the sole shareholder in the company that undertook construction of the project, which is owed a $2.4 million development fee. Clearly, Mr. Flocco's personal financial stake in this project is enormous.

As a result of Appellant's efforts, St. Casimir Senior Housing Apartments, is a beautiful thriving facility which is part of a grander plan to revitalize the entire community. The City of Yonkers has undertaken numerous unrelated projects in furtherance of its goal to gentrify the area and provide up scale affordable housing for seniors. Under the guidance and supervision of Appellant, the Residence has achieved a current occupancy of approximately 88%. Appellant expects occupancy to continue to increase, especially as a result of the decrease

in the regulated minimum age of residents from 55 to 40, which occurred as a direct result of the need for low-income housing created by the Hurricane Katrina disaster.

**C.    BUILDING AND FINANCING THE RESIDENCE**

The property was purchased by St. Casimir in December 2000.  The purchase was financed with the personal funds of Appellant's shareholders. In order to finance construction of the Residence, St. Casimir took on certain long-term debt, primarily $9.695 million in GNMA Collateralized Mortgage Housing Bonds, 11-23 St. Casimir Avenue, L.P. Project Series 2000 A (the "Municipal Bonds") issued by the IDA.   In connection with the Municipal Bonds, St. Casimir is also a party to a forty (40) year lease with the IDA, after which time St. Casimir has the right to purchase the property from the IDA for one dollar.

The debt is structured through a mortgage note (the "Mortgage"), payments on which are made by St. Casimir to Arbor National Commercial Mortgage, LLC ("Arbor") and related Security Agreement.  The Mortgage represents collateral for the repayment of the Municipal Bonds. The holders of the Municipal Bonds receive an amortized portion of the debt service, derived from payments on the Mortgage.  The debt service also includes interest and real estate tax escrows.

Thus, payment on the Bonds is made by "passing-through" payments from St. Casimir to Arbor (in the form of a mortgage payment), then from Arbor to the Indenture Trustee of the Municipal Bonds (in the form of payment on the Bonds). The Bond payments are guaranteed by United States Department of Housing

and Urban Development ("HUD").  It should be noted, upon information and belief, that HUD, at all times relevant, did not consider Appellant to be in default under the Mortgage or the Bonds and that all payments of the Bonds were current.

**D.    THE PARTNERSHIP AGREEMENT**

St. Casimir consists of three partners – Alliant Tax Credit XIV, Inc. and Alliant Tax Credit Fund XIV, Ltd. (collectively "Alliant" or "Appellees") and Appellant.  (See Doran Affidavit in Support of Appellees' Motion to Lift Automatic Stay; Exhibit A, CD-A2). On or about March 26, 2001, the following parties entered into an Amended and Restated Agreement of Limited Partnership: (i) Appellant, as general partner; (ii) Mr. Flocco, as preexisting limited partner; (iii) non-party Alliant Tax Credit IX, Inc. ("Tax Credit Inc."), as administrative limited partner; (iv) and non-party Alliant Tax Credit IX, Ltd. ("Tax Credit Ltd."), as investor partner.

For purposes of this appeal, an understanding of the relative economic interests of Alliant, and of the General Partner, the Debtor is crucial. At the termination of the "Compliance Period" as defined in the Partnership Agreement, (CD-A-2), Exhibit "A", the Debtor has the option to purchase Alliant's interest for a nominal sum. After the end of the "Compliance Period", after payment of the underlying HUD mortgage and certain other expenses, the Debtor receives 75% of the proceeds of any sale or refinance of the Property. See Partnership Agreement, (CD-A-2), Exhibit "A", Section 9.2 B(ix). Thus, while the Debtor's interest is currently 1% of St. Casimir, this increases greatly with the passage of

time.

### E.    OCCUPANCY OF THE RESIDENCE

In exchange for the right to use the historic and low-income tax credits, Tax Credit Inc. and Tax Credit Ltd. were required to make certain capital contributions, including a $1,648,063 capital contribution that was due in or about September 2004, but remained unpaid as of the Chapter 11 filing, despite due demand. Some of this was subsequently paid, after the initial lifting of the Automatic Stay, in order to cure defaults under the HUD mortgage.

Thus, if the $1,648,063 unpaid capital contribution from Appellees had been paid, that is, the moneys previously required to fund payment of the items Appellees claim as "Major Defaults", the "Major Defaults" would not have occurred.

The ability to take tax credits is reliant upon occupancy in the Residence within a certain period of time, in this case 2003. In order to take full advantage of the tax credits, Appellees unduly pressured the Debtor and caused tenants to be placed into the Residence to the detriment of the entire project.

In or about March 2002, construction of the Residence was completed. Tenants could not move into the Residence until HUD granted permission to occupy the Residence ("HUD Permission"). Typically a three month process, HUD Permission was expected in June 2002. However, HUD Permission was not received until November 2002. As a result, instead of bringing initial tenants into the building in the beginning of the summer, St. Casimir had to start the process at the beginning of winter, a difficult to time to rent senior residential

space.  This put a financial strain on the project – while only the first few tenants were beginning to occupy the building, the entire heating system was 100% operational, causing a great expense at a time that rent profits were in their infancy, and therefore low.

In late 2003, Appellees demanded that the Debtor rent the final vacant apartments so that Appellees would benefit from the tax credits.  The Debtor obtained candidates from Volunteers of America whose information indicated they would qualify for Section 8.  With Appellees' knowledge and approval, the tenants were permitted to pay their "portion" of the rent, while St. Casimir carried, on a short term basis, the balance of the rent expected to be paid by Section 8 once tenant approvals were processed.

The Section 8 subsidies for the new tenants were supposed to take effect, at the latest, in June 2004. In a terrible coincidence, unbeknownst to the Debtor, in January 2004 the government temporarily froze Section 8 approvals.

 Appellees' actions left St. Casimir with a cash flow problem, and also tragically necessitated removing the non-Section 8 tenants from the Residence. In many instances this required the Debtor to employ legal means to remove these tenants. Not only was this a costly process, but drew out the time in which there would be vacant apartments to find new *paying* tenants to occupy. Regardless, in August 2004, St. Casimir, through the diligent efforts of the Debtor, obtained occupancy and debt service sufficient to trigger Appellees' obligation to provide a capital contribution in the amount of $1,648,063.

Appellees initially refused to fund the $1,648,063 contribution. It was only

**after** they believed they had been successful, pursuant to the Bankruptcy Court's prior lift stay order (D-56, 65, 66), Appelles prior that Appellees did, in fact, fund a portion of the contribution, thus "curing" the Major Default. Appellees' prior withholding of the $1,648,063 contribution caused St. Casimir to fail to pay various expenses, including the mortgage. Had Appellees timely funded the $1.6 million dollar contribution, an operating deficit fund would have been established, as per the Partnership Agreement, (CD-A-2), Exhibit "A", containing $575,000 which would have alleviated this cash flow problem in the first place. Without Appellees' capital contribution, the Debtor, as operator of the project has been materially prejudiced.

The Debtor continued to move toward full occupancy of the Residence. At the time, the commercial spaces **had been** leased. Only three (3) residential units had to be leased before the Debtor reached 90% occupancy, which, after three months, along with a 110% debt service coverage which will also be reached, indisputably triggers Appellees' obligation to fund its $1,648,063 capital contribution required under the Partnership Agreement, (CD-A-2), Exhibit "A".

**F.    SERVICE OF NOTICE OF ALLEGED "MAJOR DEFAULTS"**

By virtue of certain alleged "Major Defaults" as set forth in letters dated April 4, 2005 (the "First Default Notice") and April 14, 2005 (the "Second Default Notice"), Alliant XIV notified the Debtor and Messrs. Flocco and Mondello and SCDLLC (the "Guarantors") that the Debtor was in Major Default under the Partnership Agreement, (CD-A-2), Exhibit "A", and demanded that these defaults be cured within fifteen (15) days from the date of the respective notices. Copies

of the First and Second Default Notice are annexed to the Doran December 21, 2005 Declaration (CD-A-2) as Exhibits J and K, respectively. The First and Second Default Notices were served properly in accordance with the Partnership Agreement, (CD-A-2), Exhibit "A". By letter dated April 25, 2005 (the "Notice of Removal"), Alliant XIV notified the Debtor and the Guarantors that pursuant to Section 11.4A of the Partnership Agreement, (CD-A-2), Exhibit "A", it was removing the Debtor as the General Partner of the Partnership based upon the Major Defaults set forth in the First Default Notice and appointing a Successor General Partner. A copy of the Notice of Removal is annexed to the Doran December 21, 2005 Declaration (CD-A-2) as Exhibit L. The Notice of Removal was also served properly in accordance with the Partnership Agreement, (CD-A-2), Exhibit "A".

On May 2, 2005 Appellant, through counsel, forwarded to counsel for Appellees a letter vigorously disputing that Appellant was in Major Default. On May 4, 2005 counsel for Appellees forwarded a letter to Mr. Flocco purporting to "defer the date of removal to such date specified by the delivery of a subsequent letter confirming such removal" (CD-A-2, Exhibit "M").

On or about September 16, 2005, with 1 ½ days left to run on the time of the Notice of Removal, Alliant XIV purported to notify the Debtor and the Guarantors by letter dated September 16, 2005 that it elected to remove the Debtor as General Partner of the Partnership, effective immediately (the "Final Removal Letter") (CD-A-2, Exhibit "N"). Even more shockingly, the Final Removal Letter was sent only to **Michael Curto, Esq., Gary Flocco's individual**

**counsel, and to Mr. Mondello care of St. Casimir.** The notice provision of the Partnership Agreement, (CD-A-2), Exhibit "A", was ignored. No notice was sent to St. Casimir Development Corp., 294 Bronxville Road, #2H, Bronxville, New York 10708, Attention: Mr. Gary Flocco, Telecopy (914) 793-8723 or to bond counsel, Mark A. Limardo, as specifically required under the Partnership Agreement, (CD-A-2), Exhibit "A". No notice whatsoever was sent by any method to Mr. Flocco or Mr. Mondello individually, or to bond counsel, as specifically required under the Partnership Agreement, (CD-A-2), Exhibit "A". **The District Court found, in reversing the previous Bankruptcy Court order lifting the Automatic Stay, such service ineffective, and thus found that the Debtor retained the right to assume the Partnership Agreement, (CD-A-2), Exhibit "A".**

## G.    STATEMENT OF THE CASE AND PRIOR PROCEEDINGS

By Motion dated December 21, 2005, Appellees asked the Bankruptcy Court to vacate the automatic stay (i) because Appellant's general partner interest in St. Casimir was terminated prior to the Filing Date based upon alleged "Major Defaults" under the Partnership Agreement, (CD-A-2), Exhibit "A", and (ii) based upon lack of adequate protection in that a foreclosure could occur and/or based upon alleged defaults in Appellant's obligations to manage the Residence. The Bankruptcy Court granted Appellees' motion, terminating the automatic stay solely on the basis of prepetition termination of Appellant's interest under the Partnership Agreement, (CD-A-2), Exhibit "A", and did not formally rule upon lack of adequate protection.

The Debtor timely filed a notice of appeal. The District Court reversed the prior order of the Bankruptcy Court, see, e.g. In re St. Casimir Development Corp., 358 B.R. 24 (S.D.N.Y. 2007) and vacated the injunctive relief terminating the Debtor as General Partner. After oral argument was heard on December 21, 2006, and apparently out of concern that it faced an unfavorable ruling, Alliant served fresh notices of termination, on or about January 11, 2007.

Thereafter, and subsequent to the District Court Reported Decision, Alliant brought on its "Emergency Motion to Lift Automatic Stay". This motion was granted at a hearing held February 15, 2007. Subsequently, an Order signed on February 28, 2007 Granting Motion for Relief from Stay for creditor, Alliant Tax Credit XIV, Inc. (D-22). This appeal followed.

## ARGUMENT

### POINT I

**THE BANKRUPTCY COURT IMPROPERLY
DENIED THE DEBTOR ANY OPPORTUNITY TO
ASSUME THE PARTNERSHIP AGREEMENT**

The District Court, in the District Court Reported Decision, held that the Debtor could assume the Partnership Agreement, (CD-A-2), Exhibit "A". The Court, in its holding, stated:

> Therefore, because Alliant needed to take some additional affirmative action to effect the removal of the Debtor as General Partner and because Alliant's effort to take that action pre-petition was ineffective as a matter of law, the Debtor was never removed as General Partner. Consequently, the Debtor may choose to assume or reject the Partnership Agreement under § 365. In re St. Casimir Development Corp.  358 B.R. 24, 45 (S.D.N.Y., 2007)

11 U.S.C. § 365 of the Bankruptcy Code provides, in relevant part, as follows:

> (a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c) and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

>> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, the such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

>> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

>> (C) provides adequate assurance of future performance under such contract or lease.

It is axiomatic that Section 365(b) provides a mechanism, and determines the procedure, for a Debtor to cure a default under an executory contract or

unexpired lease. <u>See</u>, <u>e.g.</u>, <u>Moody v. Amoco Oil Co.</u>, 734 F.2d 1200, 1212-1213

(7th Cir. 1984). <u>See</u> <u>also</u> <u>In re St. Casimir Development Corp.</u>, 358 B.R. 24

(S.D.N.Y., 2007). If a contract or lease did not terminate prior to the filing of a

bankruptcy petition, it is "executory", and defaults thereunder can be cured in

accordance with Section 365(b). In <u>Moody,</u> <u>Id.</u>, the Court noted:

> Section 365**Error! Bookmark not defined.** of the Code only gives
> a debtor the right to assume an executory contract. If a contract has
> been terminated pre-bankruptcy, there is nothing left for the debtor
> to assume. However, the termination must be complete **and not**
> **subject to reversal, either under the terms of the contract or**
> **under state law**…. Moody, at 1212.

Inasmuch as the Debtor's interest in the Partnership was still extant as of the

time of the filing of the petition, the Debtor may assume or reject an executory

contract at any time before the confirmation of a plan of reorganization pursuant

to Section 365 of the Bankruptcy Code.    To that end, the Debtor also has the

earlier of confirmation or an order compelling assumption or rejection, to cure any

defaults under such an executory contract, which is a prerequisite of such an

assumption. The <u>St. Casimir,</u> <u>Id.</u> decision further clarifies this issue. The Court

stated:

> The Seventh Circuit (in <u>Moody,</u> <u>Id.)</u> held that these contracts
> had been effectively terminated pre-petition and were therefore
> not subject to §365, because Amoco had taken the last act
> necessary to work the termination of the contract, prior to the
> bankruptcy filing (language of <u>Moody,</u> <u>Id.</u> case, as substantially
> quoted above, omitted)….

The Court, in the District Court Reported Decision, held that Alliant needed to

take some additional affirmative action to effect the removal of the Debtor as

General Partner and because Alliant's effort to take that action pre-petition was

ineffective as a matter of law, the Debtor was never removed as General Partner. Consequently, the Debtor deserves at least some opportunity to assume or reject the Partnership Agreement, (CD-A-2), Exhibit "A", under §365. The holdings of the District Court in the District Court Reported Decision are "law of the case" with reference to the Debtor's right to assume or reject the Partnership Agreement, (CD-A-2), Exhibit "A". In The North River Insurance Company v. Philadelphia Reinsurance Corporation, 63 F.3d 160, 164, 165 (2d Cir. 1995) the Court stated:

> It is generally accepted that the law of the case doctrine does not limit the power of a court, but " 'merely expresses the practice of courts generally to refuse to reopen what has been decided.' "  5 Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 817, 108 S.Ct. 2166, 2178, 100 L.Ed.2d 811 (1988) (quoting Messinger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912) (Holmes, J.)). But while a "court sometimes may review an earlier ruling, ... [n]evertheless, because there is a strong policy favoring finality the court exercises its underlying power to review earlier rulings 'sparingly.'"  McClain v. United States, 676 F.2d 915, 917 (2d Cir.) (citations omitted), cert. denied, 459  U.S. 879, 103 S.Ct. 174, 74 L.Ed.2d 143 (1982).  A court should be "loathe" to revisit an earlier decision "in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.' "  Christianson, 486 U.S. at 817, 108 S.Ct. at 2178 (quoting Arizona v. California, 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 1391 n. 8, 75 L.Ed.2d 318 (1983)). The North River Insurance Company v. Philadelphia Reinsurance Corporation, 63 F.3d 160, 164, 165 (2d Cir. 1995).

As such, the Debtor maintains that it has both the power and the right to assume the Partnership Agreement, (CD-A-2), Exhibit "A" and that such right has not expired. The Debtor may therefore cure the alleged defaults under the

Partnership Agreement, (CD-A-2), Exhibit "A", under its plan of reorganization which specifically provides for same.

The District Court Reported Decision discussed extensively the tension between the expiration of the "cure period" under the April 14, 2005 Second Default Notice and the April 25, 2005 Notice of Removal, and held that the expiration of a contractual cure period did not operate to terminate the Debtor's ability, in a subsequent bankruptcy filing, to assume the contract. The Court held:

> Another recent bankruptcy case in this district provides further support that the Debtor may assume the Partnership Agreement as an executory contract pursuant to § 365 because--even though its right to cure the Major Defaults expired in April 2005-- Alliant could only remove the Debtor through an affirmative post-petition act. *See In re Margulis,* 323 B.R. 130, 134-35 (Bankr.S.D.N.Y.2005). In *Margulis,* an individual entered into an agreement with an insurance company under which the individual was granted an option to pay $140,000 by May 15, 2004, in settlement of the insurance company's contingent claim against the individual for $790,000; if he failed to make the payment when due, he was granted an additional ten days to pay the option price, but the insurance company did not have to provide a notice of default. Two days after failing to meet the May 15 deadline, the individual filed his Chapter 11 petition. Eight days later, the option period expired. When the insurance company subsequently filed a claim for the full $790,000 debt, the individual argued that he should only be liable for the $140,000. The court disagreed, emphasizing that no post-petition action was needed from the insurance company to terminate the option:
>
>> [T]he automatic stay does not ... stop a contract from terminating by its own *45 terms as long as the termination does not depend on a post-petition "act."
>> * * * * * *
>> The effectiveness of the termination does not depend on the timing of the default but on whether termination requires an act prohibited by the automatic stay.
>> * * * * * *

16

> [T]he issue must be whether termination requires the non-debtor party to undertake some post-petition affirmative act.... *When termination of the contract requires an affirmative act of the non-debtor party, the contract remains executory because such an act is stayed under 11 U.S.C. § 362(a). When termination occurs without any action by the non-debtor party, the contract is no longer executory and no longer subject to assumption or rejection.*

*Id.* at 134-35 (emphasis added). As discussed above, the Partnership Agreement clearly required Alliant to undertake a three-step removal procedure in order to remove the Debtor as General Partner: 1) a fifteen day notice of default, 2) a ten day notice of intent to remove, and 3) a final notice of removal. Two of these steps occurred prior to the Debtor's Chapter 11 bankruptcy petition. The last one did not. Because the final removal letter constitutes "an affirmative act of the non-debtor party," which is prohibited by the automatic stay, the Partnership Agreement remains executory. *Id.*

New York partnership law provides no relief for Alliant. Rather, New York law enforces the terms of partnership agreements by providing that an entity ceases to be a general partner of a limited partnership when "the general partner is removed as a general partner *as may be provided in the partnership agreement.*" N.Y. Partnership Law § 121-402(c) (McKinney 2006) (emphasis added). As discussed above at length, the Debtor has not been removed as the General Partner in accordance with the Partnership Agreement.

Therefore, because Alliant needed to take some additional affirmative action to effect the removal of the Debtor as General Partner and because Alliant's effort to take that action pre-petition was ineffective as a matter of law, the Debtor was never removed as General Partner. Consequently, the Debtor may choose to assume or reject the Partnership Agreement under § 365. In re St. Casimir Development Corp., 358 B.R. 24, 44 - 45 (S.D.N.Y.,2007).

The Bankruptcy Court, during the February 15, 2007 hearing, did not correctly apply this standard. The Court, in the February 15, 2007 Transcript (D-21), Page 36 Line 23 to Page 37 Line 21 stated:

> THE COURT: Okay. Let me say we all be may be a little uncertain as to what Judge McMahon intended there. But what I have no uncertainty about is this; I have never in all my years on the bench heard or seen any suggestion that the filing of a petition in bankruptcy, other than as specifically provided in the codes -- and there are provisions in the code -- but other than is specifically provided in the code, I have never heard that the bankruptcy code -- that the filing of a petition in bankruptcy has the effect of changing the party's contract. I'm not aware of that. Some code provisions do permit that, but I'm not aware if any of it would be applicable here. Ms. Mann has cited a wonderful array of cases, including my reversed decision in Penn Traffic, for the proposition that the filing in bankruptcy doesn't change contractual rights, obligations and entitlements. All those cases, save only mine in Penn Traffic, I think are good law and I think that proposition is good law. And, you know, it's not that you didn't know that this is an issue. Obviously, you did, because it was in your face from all those citations. So I don't know what two more weeks will do and as Judge McMahon pointed out in her February 7 ruling, there'll probably be an appeal from this and perhaps she'll tell us.

Thus, the Bankruptcy Court "overruled" the District Court Reported Decision, or otherwise failed to apply it. The Court's ruling in the District Court Reported Decision is not novel or unique, and Courts frequently find that provisions of contracts that appear to frustrate assumption and assignment of agreements by debtors pursuant to 11 U.S.C. §365(a) are void.

The Court should note that until the issuance of the District Court Reported Decision, there was so much uncertainty as to the ability of the Debtor to assume the Partnership Agreement, (CD-A-2), Exhibit "A", that it could not develop serious interest in obtaining a purchaser or funder This was alleviated by

18

the District Court Reported Decision. However, the Bankruptcy Court declined to give the Debtor an opportunity to seek to exercise the powers so recently ratified by the District Court Reported Decision. The Debtor appeared in Court with a potential purchaser of the partnership interest, or financier of a plan under which the Debtor would cure its defaults under the Partnership Agreement. The Court signally refused to receive argument or testimony from the Debtor's proposed assignee and/or lender, Nick Sprayragen.

> THE COURT: What is the debtor's proposal here?  Plan?

> MS. ARNOLD: That was my next statement, Your Honor. The debtor has provided a written offer to Alliant for $2.4 million in cash and assumption of liabilities under the bonds, which are $9.6 million for a purchase of the general partnership interest. And that is one offer from a separate party. And in addition, we have another interested party here, Mr. Spraygregen, who has previously been in this court, has been interested in being the investor here, their financier, but due to the appeal, that's why the delay occurred in being able to put that together. So we have at least two parties; the first offer is actually notice in Alliant's reply in support of its motion - the pages aren't numbered, so I can't tell you what page. Those two offers -- at least -- and even by Alliant's estimate in its papers, its damages, even assuming that's all  true, are 2.2. million. So the offer provided in excess -- and we also believe that Mr. Spraygregen would more than be able to provide the cure amounts, which are subject to determining the proper amount.

> THE COURT: And how soon do you think all that's going to be brought to fruition?

> MS. ARNOLD: Extremely soon. As fast as possible.

> THE COURT: A matter of a couple of weeks? A few weeks?

> MS. ARNOLD: I would have to let Mr. Spraygregen's attorney -- I also note Alliant has refused to give us any financial -- so to the extent that they need to do due diligence on the current stance of the building, we would need Alliant's opening the books and letting us do a walk through the premises, which I

19

have requested in writing last month and was denied. But subject to that due diligence, we have two parties ready to go at this time. The only delay was because of, obviously, the appeal process and we moved immediately, as soon as we got that January 11th order, to put these offers up to Alliant and it's been, obviously, to no resolve.

THE COURT: All right. What's your response to that?

*****

THE COURT: Right. Let me just ask, do these two proposed acquirers propose to sell the asset to the partnership?

MS. ARNOLD: No, Your Honor. It's the debtor's interest, not the assets of the partnership.

THE COURT: Just the one percent interest as limited partner -- as general partner.

MS. ARNOLD: Correct, Your Honor. And I can have -- Mr. Nash can speak as to his client's true interest and involvement --

THE COURT: Tell us, Mr. Nash.

MR. NASH: Yes, Your Honor. It's true we don't have a formal proposal, but my client is very interested in this property. He has ties to Yonkers. He's interested in developing property in Yonkers. He's working on --

THE COURT: When are we going to have something in writing?

MR. NASH: I --

THE COURT: Sort of show me the money. Where's the meat?

MR. NASH: I just got involved in this on Tuesday, Your Honor.

THE COURT: So you don't have any idea.

MR. NASH: No, I do have an idea. I told Mr. Glucksman I needed about a two-week period to do due diligence, to review the documents, to review the issues on the building and within a period of about two weeks time I would be in a position to fish or cut bait and I'm not here to in any way impede the process. I'm here to try to help the process.

> THE COURT: So the idea is your client wishes to purchase and thereby become the general partner.
>
> MR. NASH: That's correct. [Transcript (D-21), Page 14 Line 7 to Page 18 Line 20]

Thus, the Bankruptcy Court did not give the Debtor the opportunity, prior to lifting the stay, to develop an economic plan. While it is no doubt true that the Debtor does not have an unlimited opportunity to hold its creditors and/or contra-parties to contracts at bay, see, e.g. In re Pegasus Agency, Inc.,  101 F.3d 882 (2d Cir.,1996), the twenty-three days elapsing between the entry of the District Court Reported Decision and the Bankruptcy Court argument on this motion to lift the stay is clearly not such an opportunity.

## POINT II

### THE DEBTOR CAN FREELY ASSUME AND ASSIGN ITS PARTNERSHIP INTEREST

Contrary to the Bankruptcy Court's ruling, the assumption or rejection provisions of 11 U.S.C. §365(a) frequently materially alter the effect of contractual terms, and vitiate most anti-assignment provisions and ipso facto clauses. See, e.g. In re Schick  235 B.R. 318 (Bkrtcy.S.D.N.Y.,1999)In re Adelphia Communications Corp.,  359 B.R. 65 (Bkrtcy. S.D.N.Y.,2007). The Adelphia, Id. Court stated:

> Though this Court would not necessarily agree with every aspect of the lengthy 68-page opinion in *Supernatural Foods,* this Court thinks the *Supernatural Foods* court got it right when it focused on the distinction between rules of law of general applicability (which should, as a general matter, pass muster under section 365(c)(1)), and those which merely embody or make enforceable limitations on assignment that are contained within a contract-which as a general matter should not pass

21

muster, and should be voided under section 365(f).[FN35] And this Court agrees with the *Supernatural Foods* court's conclusion:

FN35. *See id.* at 789 n. 84 (referring to the legislative history, noting that section 365(c) would apply "only in the situation in which applicable law excuses the other party from performance ***independent of any restrictive language in the contract or lease itself***") (bold and italics by the *Supernatural Foods* court). This Court concludes, therefore, that generally applicable laws which restrict or prohibit transfer of rights or duties under contracts (thereby excusing performance for the non-transferring party) *independent of any restriction contained within the contract itself,* are covered by the provisions of § 365 (c)(1). Thus, such laws may be enforced against the bankruptcy trustee to prohibit or restrict the trustee's attempt to assume and assign such contracts. However, laws *for which operation of that law is dependent upon contractual provisions* prohibiting, restricting, or conditioning transfer are not excepted from § 365(f)(1) by § 365(c)(1), and are not enforceable against a trustee seeking to assume and assign a contract of the debtor.
[FN36] In re Adelphia Communications Corp., 359 B.R. 65, 77 (Bkrtcy. S.D.N.Y.,2007) (emphasis in text).

The provisions of Partnership Law § 121-702 restricting the assignability of the

interests of the general partner are restrictions on assignability of the kind the

Adelphia, Id. Court found void, i.e., restrictions that depend on the terms of a

private contract. Partnership Law § 121-702 states as follows:

(a) Except as provided in the partnership agreement,

(1) A partnership interest is assignable in whole or in part;

(2) An assignment of a partnership interest does not dissolve a limited partnership or entitle the assignee to become or to exercise any rights or powers of a partner;

(3) The only effect of an assignment is to entitle the assignee to receive, to the extent assigned, the distributions and allocations of profits and losses to which the assignor would be entitled; and

(4) A partner ceases to be a partner and to have the power to exercise any rights or powers of a partner upon assignment of all of his partnership interest. Unless otherwise provided in the

partnership agreement, the pledge of, or the granting of a security interest, lien or other encumbrance in or against, any or all of the partnership interest of a partner shall not cause the partner to cease to be a partner or to have the power to exercise any rights or powers of a partner.

(b) The partnership agreement may provide that a limited partner's interest may be evidenced by a certificate issued by the partnership and may also provide for the assignment or transfer of any of the interest represented by such a certificate. A limited partner's interest may be a certificated security or an uncertificated security within the meaning of section 8-102 of the uniform commercial code if the requirements of section 8-103(c) are met, and if the requirements are not met shall be deemed to be a general intangible.

(c) Unless otherwise provided in a partnership agreement and except to the extent assumed by agreement, until an assignee of a partnership interest becomes a partner, the assignee shall have no liability as a partner solely as a result of the assignment.

The Court, in Schick, Id. stated:

The parties agree that the partnership agreement is an executory contract. ( Compare Joint Memorandum of Law in Further Support of the Trustees' Joint Application [Etc.], dated May 21, 1999, at 13 (" Joint Mem." ) with Objection of West Ventures, Inc. [Etc.], dated May 5, 1999, at 6.) Accordingly, they focus on the limitations on assumption and assignment contained in 11 U.S.C. § 365, and in particular, the interplay between sections 365(c)(1) and 365(f). In re Schick  235 B.R. 318, 322 (Bkrtcy.S.D.N.Y.,1999).

The Schick, Id. Court stated further:

As this case concerns statutory restrictions on the assignment FN5 of limited partnership interests, we turn to the relevant partnership law. Section 121-101(m) of the Act defines a "partnership interest" to mean the partner's share of profits and losses and his right to receive distributions. Subject to contrary contractual restrictions (which are immaterial under section 365(c)), a partnership interest is assignable. Act, § 121-702(a)(1). An assignment does not, however, entitle the *324 assignee to become or to exercise the rights of a partner. Id., § 121-702(a)(2); see id., § 121-704(a) (explaining how the

23

> assignee of a limited partner interest may become a partner).FN6 Rather, it only entitles the assignee to receive distributions and allocations of profits and losses. Id. § 121-702(a)(3); accord In re Wilmot, 244 A.D.2d 980, 665 N.Y.S.2d 783, 784 (N.Y.App.Div.1997). In re Schick  235 B.R. 318, 323 -324 (Bkrtcy.S.D.N.Y.,1999).

The Schick, Id. Court stated further:

> Accordingly, I conclude, subject to the discussion in the next section, that while the trustees can assume and assign their various economic rights to Dears, they cannot force the Objectants to admit Dears as their substitute limited partner against their will. In re Schick  235 B.R. 318, 326 (Bkrtcy.S.D.N.Y.,1999).

The Schick, Id. Court, at that point, appeared to hold that the Trustee (or debtor-in-possession) could only assign the economic interests of the Debtor, not any participatory or voting interest. The Schick, Id. Court went on to hold, however, that the partnership in question could be forced to justify its reasons for excluding a proposed assignee as "non-pretextual". The Court stated:

> Having concluded that consent is necessary, I must consider whether the general partner has breached the Agreement or otherwise wrongfully withheld consent to the admission of Dears.
>
> *****
>
> Here, the Agreement gives the general partner the "absolute discretion" to consent or withhold consent to the admission of a substitute limited partner. "Absolute discretion," however, does not necessarily mean what it suggests, or negate the implied covenant of good faith and fair dealing.
>
> In re Schick  235 B.R. 318, *327 -328 (Bkrtcy.S.D.N.Y.,1999).

The Schick, Id. Court stated further:

> The crux of the trustees' argument is that the general partner has exercised its "absolute discretion" for an improper motive, and the reasons it offers are a subterfuge.FN9 They contend that

24

the general partner is withholding consent to exert leverage and acquire the trustees' interests at a lower price.

*******

The Objectants, in turn, rely on the general partner's "absolute discretion," and dispute the trustees' allegations and the charge of bad faith. Initially, I reject their implication that the bad faith exercise of the general partner's absolute discretion is unreviewable as a matter of law; it is only absolute if the parties intended it to be. However, they also intimate two specific reasons for the general partner's refusal to consent. First, the consent provision*329 in the Agreement was intended to maintain the balance between the two "factions" that joined together to form the Partnership. ( *See Objectants' Reply,* at 12-13.) Their concern is that if Dears is admitted, it will upset the balance and control a 73.5% vote of limited partner interests. According to the Objectants, the general partner gave its advance consent to the admission of a successful bidder during earlier negotiations as part of an overall settlement and under the threat of litigation. ( *Id.* at 19-20.)

Second, the Objectants hold that the proposed assignee is unacceptable. The principal of Dears is Adam Katz. The Objectants know him only by reputation. They point to uncomplimentary press reports describing abusive and harassing tactics directed at tenants in buildings Katz controlled, ( *id.,* at 19, Exhibits B, C.), and past legal problems with the New York Attorney General concerning a cooperative conversion. *Id.* at 18-19; *see Attorney General v. Katz,* 81 A.D.2d 554, 438 N.Y.S.2d 327 (N.Y.App.Div.1981), *aff'd,* 55 N.Y.2d 1015, 449 N.Y.S.2d 476, 434 N.E.2d 712 (1982).[FN10] They are concerned that if they decide to convert the building to cooperative ownership, Katz's affiliation with the Partnership may hurt the success of a conversion plan. ( *Objectants' Reply* at 18-19.)

FN10. The press reports and litigation with the Attorney General primarily if not exclusively concern Mr. Katz's father, Curtis Katz.

In substance, the trustees charge that the general partner's reason is pretextual, and that the general partner (and possibly the other limited partners) are simply trying to force the trustees to sell their interests on the cheap. Implicitly, the trustees also maintain that the partners did not intend that the general partner could refuse to consent, even in its absolute discretion, to accomplish this end. These allegations state a claim for breach of the implied covenant of good faith and fair dealing. *See White*

> *Stone Partners, L.P. v. Piper Jaffray Cos.,* 978 F.Supp. at
> 880.[FN11] **Accordingly, the matter requires an evidentiary
> hearing at which the trustees will bear the burden of proof.**
> See *Fitzgerald v. Cantor,* 1999 WL 182571, at *1; *Gelder Med.
> Group v.. Webber,* 394 N.Y.S.2d 867, 363 N.E.2d at 577. <u>In re
> Schick</u>  235 B.R. 318, 328 -329 (Bkrtcy.S.D.N.Y.,1999).

Thus, under both <u>Schick, Id.</u> and <u>Adelphia, Id.</u> the Bankruptcy Court was wrong

to summarily reject the possibility that Alliant could be forced to accept either an

assumption of the Partnership Agreement, (CD-A-2), Exhibit "A", by the Debtor,

and/or its assignment.

The Court ignored the dictates of both <u>Schick, Id.</u> and <u>Adelphia, Id.</u>  by

foreclosing the possibility of compelled assumption and/or assignment of the

Partnership Agreement, (CD-A-2), Exhibit "A", where it erroneously stated,

Transcript, (D-21), Page 24, Lines 5 through 9:

> MS. ARNOLD: And flat across the board denial of any deal
> under the sun is disingenuous by Alliant --
>
> THE COURT: It's not disingenuous. They have the right to do it.
> That's what the partnership law says. You don't have to be a
> partner with somebody you didn't choose.

The Court thus misapplied the legal standards set forth in the District

Court Reported Decision, <u>Schick, Id.</u> and <u>Adelphia, Id.</u> See Transcript, Transcript

(D-21), Page 19 Lines 4 through 15:

> MS. ARNOLD: If it cannot be done under partnership law, there
> can also be an alternate financing deal done. We can structure
> the deal to make the appropriate - to satisfy the appropriate law.
> The money is there, the interest in the investment is there.
> However, the deal needs to be structured. I don't think that's a
> problem. What I would suggest, Your Honor, is given Mr. Nash's
> discussion, if Alliant will provide us with due diligence, we could
> adjourn this matter for two weeks and you can see; fish or cut
> bait. The offer will be on the table before Your Honor or not.

THE COURT: All right.

The Transcript (D-21), Page 20 Line 25 through Page 23 Line 16

continued:

MS. ARNOLD: As I've heard Your Honor say before on other cases, the value of something is what someone's willing to pay for it and if someone's willing to pay that money, obviously, they see a value in it and there is one.

MR. GLUCKSMAN: Your Honor, I normally --

THE COURT: Say your point.

MR. GLUCKSMAN: The general partner is St. Casimir Development Corp., not Gary Flacko (sic). So that would be the answer on the partnership law aspect and I think that 1120 -- I forget whether it's 1123 or whatever the contents of a plan would permit the change of identity of the person at the helm of St. Casimir Development Corp., whereby Gary Flacko's interest in St. Casimir Development Corp. would yield to Nick Spraygregen or his --

THE COURT: Do you really think that this court is going to approve a situation which you've disclaimed in interest in in your papers under which Mr. Flacko in any way, shape or form would resume the actual management of this?

MR. GLUCKSMAN: Your Honor --

THE COURT: I can tell you right now, it's going to have to be a higher court than this that will permit that.
MR. NASH: Your Honor, clearly I think --

THE COURT: Never. Not between now and 2020.

MR. GLUCKSMAN: Your Honor, I think that that is crystal clear. So my suggestion would be the same as Ms. Arnold's, obviously, is that we adjourn the period for a short due diligence period that we direct some opening of the  books and records and a walk through by Mr. Spraygregen, or other interested parties during that period, and that we –

THE COURT: Because it really wouldn't be Mr. Flacko that would be in charge.

27

MS. ARNOLD: Absolutely not.

THE COURT: It would be new people.

MR. GLUCKSMAN: That's correct.

MS. ARNOLD: Absolutely. Yes.

THE COURT: But why wouldn't that violate the partnership law?

MS. ARNOLD: However the deal can be structured as to legally --

THE COURT: You think a court isn't going to see through that?

MS. ARNOLD: A new purchaser would mean a new manager and a management company that's very well versed in running this type of property and Mr. Flacko would be fully and wholly removed.

THE COURT: Unless you're going to tell me that that they're wrong about what they say about the partnership law, and I doubt that you will, because it makes sense, they're not required -- Alliant -- the Alliant interests are not required to accept anybody as the new general partner. They're not required to do that. And this case is a perfect example of why they shouldn't be required to. Mr. Spraygregen may be the greatest, most honorable, financially responsible person east of the Mississippi. But that doesn't require that Alliant accept him or anybody he may designate. They've been burned already.

MS. ARNOLD: Your Honor, the deal can be structured such that the money can come in and we can satisfy Alliant as to the propriety of the person coming in and that's the purpose of 365 is to --

THE COURT: They have said you can't satisfy us. We don't have any -- we won't have it. And they're entitled to say that. You cannot satisfy us. We've been burned before. The deal was practically lost because it was on the threshold of being referred to HUD, which would have unwound the tax -- am I right? Wasn't that your point?

The Court did not engage in the analysis called for in the District Court Reported

Decision, Schick, Id. and Adelphia, Id. in order to determine if the Partnership

28

Agreement, (CD-A-2), Exhibit "A", indeed could be assumed by the debtor-in-possession, thus providing "for the reasonable possibility of a successful reorganization within a reasonable time", United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd. 484 U.S. 365, 376, 108 S.Ct. 626, 633 (U.S. 1988). If such reorganization is in prospect, even if the Debtor lacks equity in St. Casimir, the lifting of the automatic stay was erroneous.

Many decisions even look behind the language of various contract provisions, find them to be disguised anti-assignment provisions and void them. See, e.g. In re Tobago Bay Trading Co., 112 B. R. 463 (Bankr. N. D. Ga. 1990); Coleman Oil Co. v. Circle K Corp. (In re Circle K Corp.), 127 F. 3d 904,910-l 1 (9th Cir. 1997)(majority included former Supreme Court Justice Byron White)(citations omitted), cert. denied, 118 S. Ct. 1166 (1998); see also South Coast Plaza v. Standor Jewelers W., Inc. (In re Standor Jewelers W., Inc.), 129 B. R. 200,203 (B. A. P. 9th Cir. 1991)(" Pursuant to § 363(f). . . a provision which conditions or restricts the ability of a debtor to fully realize the economic value of its lease upon assignment is invalid); Robb v. Schindler, 142 B. R. 589 (D. Mass. 1992); In re Caldor, Inc.-NY, Chapter 11 Case No. 95 B 44080 (Bankr. S.D.N.Y. June 30, 1998) (order authorizing debtor to assume and assign Hemdon lease to Kohl's and finding that permitting store to go dark and alterations did not constitute default under lease nor give landlord right to cancel remaining term of lease); In re Jamesway Corp., 201 B. R. 73 (Bankr. S.D.N.Y. 1996).

In In re Tobago Bay Trading Co., 112 B. R. 463 (Bankr. N. D. Ga. 1990), lessors of a shopping center objected to the court's authorization of the debtor's

proposed retail store closing program. The court held that the debtor would be allowed to conduct liquidation sales notwithstanding any contrary provision in the shopping center leases; "Where provisions of an unexpired lease conflict with [bankruptcy]policies to prevent or hinder reorganization, the court may find such provisions to be unenforceable." Id. at 466. The court went on to state:

> The [b]ankruptcy court, as a court of equity, must balance the congressionally expressed public policy of the Bankruptcy Code with the objectors'rights to rely on their bargained-for agreement. Where the benefit to the debtor outweighs the potential harm to the lessor, the court may exercise its equitable powers to deny enforcement of a clause that would have severe negative consequences on a Chapter 11 debtor's ability to reorganize. To further legislative nolicies, it is sometimes necessary to compromise private rights which conflict with a debtor's statutorv right to receive the full benefit of its reorganization or liauidation efforts.

Id. at 467 (citations omitted)(emphasis added).

For example, Section 365(f)(1), by operation of law, invalidates lease provisions that prohibit, restrict, or condition the assignment of an unexpired lease. Courts have consistently invalidated such lease provisions because they create forfeitures by the estate and windfalls to landlords. See, e.g. Coleman Oil Co. v. Circle K Corp. (In re Circle K Corp.), 127 F. 3d 904,910-I 1 (9th Cir. 1997) where the Court stated:

> Coleman argues that the bankruptcy court lacks the power to "rewrite" the parties'contract. But all kinds of interferences with contractual rights occur in bankruptcy proceedings. . . . Thus no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365.

Circle K, Id. (majority included former Supreme Court Justice Byron White)(citations omitted), cert. denied, 118 S. Ct. 1166 (1998); see also South Coast Plaza v. Standor Jewelers W., Inc. (In re Standor Jewelers W., Inc.), 129 B. R. 200,203 (B. A. P. 9th Cir. 1991)(" Pursuant to § 363(f). . . a provision which conditions or restricts the ability of a debtor to fully realize the economic value of its lease upon assignment is invalid); Robb v. Schindler, 142 B. R. 589 (D. Mass. 1992); In re Caldor, Inc.-NY, Chapter 11 Case No. 95 B 44080 (Bankr. S.D.N.Y. June 30, 1998) (order authorizing debtor to assume and assign Hemdon lease to Kohl's and finding that permitting store to go dark and alterations did not constitute default under lease nor give landlord right to cancel remaining term of lease); In re Jamesway Corp., 201 B. R. 73 (Bankr. S.D.N.Y. 1996). The Jamesway, Id. Court stated:

> Courts do not have carte blanche to rewrite leases under §§ 365(f)(1) and (f)(3) or any provision of the statute. Simpson, *Leases and the Bankruptcy Code: Tempering the Rigors of Strict Performance,* 38 BUS.LAW. 60, 75 (cited hereinafter as " *Simpson* "); *In re Howe,* 78 B.R. at 231. However, § 365 reflects the clear Congressional policy of assisting the debtor to realize the equity in all of its assets. *See In re Howe,* 78 B.R. at 230 n. 7 (citing *Matter of Haffner's 5 Cent to $1.00 Stores, Inc.,* 26 B.R. 948, 949 (Bankr.N.D.Ind.1983); *Simpson* at p. 61). Toward that end, § 365(f)(1) permits assignment of an unexpired lease despite a clause in the lease prohibiting, conditioning or restricting the assignment. Subsection (f)(3) goes beyond the scope of subsection (f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract because it is being assumed or assigned, "thereby indirectly barring an assignment by the debtor." *In re Howe,* 78 B.R. at 226 (citing *In re J.F. Hink & Son,* 815 F.2d at 1317-18; *In re Sapolin Paints, Inc.,* 20 B.R. 497, 509 (Bankr.E.D.N.Y.1982)). "The essence of Subsections (1) and (3) is that all contractual provisions, not merely those entitled 'anti-assignment clauses' are subject to the court's scrutiny regarding their anti-assignment effect." *Id.* at 229-30 (citing *Matter of U.L. Radio*

*Corp.,* 19 B.R. 537, 543 (Bankr.S.D.N.Y.1982)). In re Jamesway
Corp.  201 B.R. 73, 77 -78 (Bkrtcy.S.D.N.Y.,1996)

See also, Howe, 78 B. R. at 231 ("Any lease provision whose sole effect is to

restrict assignment in any way, not merely a provision which flatly refuses

assignment, is subject to negation under Section 365(f).")(emphasis added).

Thus, the decisional law of this District allows the Court to invalidate or

condition the enforcement of contractual provisions, including those in the

Partnership Agreement, (CD-A-2), Exhibit "A", which frustrate the Debtor's ability

to reorganize without any concomitant gain for the contra-party's legitimate

interests.

## POINT III

### THE COURT APPLIED IMPROPER STANDARDS
### IN DECIDING TO LIFT STAY

In the District Court Reported Decision the Court stated:

> It is well-settled that, absent some showing of "cause," courts
> will not grant a limited partner's motion for relief from the
> automatic stay in order to remove the Chapter 11 debtor as
> general partner. *See, e.g., In re Cardinal Indus., Inc.,* 116 B.R.
> 964 (Bankr.S.D.Ohio 1990). Where, *42 as here, the only
> "cause" shown by Alliant is its sending of a removal letter that
> failed to comply with the Partnership Agreement's notice
> provision, the bankruptcy court's granting of relief from the
> automatic stay was in error. In re St. Casimir Development
> Corp.  358 B.R. 24, 41 -42 (S.D.N.Y.,2007).

Thus, the traditional standards applying to relief from the automatic stay apply.

The Court, in In re Cardinal Industries, Inc.  116 B.R. 964, 982 (Bkrtc.

S.D.Ohio,1990) stated:

> Based upon the foregoing, the Court finds that the Debtor's
> Management Interest was not terminated by its bankruptcy filing

> pursuant to 11 U.S.C. § 365(e)(2)(A) and the *ipso facto* clauses are not to be given effect under the circumstances presently before the Court. Applicable nonbankruptcy law does not prohibit assumption of the Partnership Agreements by the Trustee on behalf of the estate simply because the agreements are not assignable to a third party. And, assumption by the Trustee on behalf of the estate when the performance is to be rendered by the Debtor for the benefit of the estate is not an assignment. Therefore, the automatic stay was not lifted as a matter of law and the Movants are not permitted to remove the Debtor as general partner. In re Cardinal Industries, Inc. 116 B.R. 964, 982 (Bkrtcy.S.D.Ohio,1990).

The Court erroneously focused on the commercial harm to Alliant by the Debtor's pre-petition conduct and the delay occasioned by Alliant's own motion practice.

This was error. The Cardinal, Id. Court stated further:

> The Court's focus must be on the harm occasioned by the imposition of the stay itself. *Id.* [referring to In re Opelika Mfg. Corp., 66 B.R. 444, 449 (Bankr.N.D.Ill.1986)] at 448 ("cause to lift the stay exists when the stay harms the creditor"); Ginsberg, *Bankruptcy* para. 3306 (1985) ("a creditor can seek to have the stay lifted for cause when [the creditor] is hurt by the stay"). In re Cardinal Industries, Inc. 116 B.R. 964, 983 (Bkrtcy. S.D.Ohio,1990).

Chapter 11 inevitably delays the remedies of creditors. The mere delay of creditors does not create cause for relief from the automatic stay. See, e.g.

Matter of Cohoes Indus. Terminal, Inc., 931 F.2d 222 (2d Cir.,1991). The Cohoes, Id. Court stated:

> Filing a bankruptcy petition with the intent to frustrate creditors does not by itself "establish an absence of intent to seek rehabilitation." *Banque de Financement, S.A. v. First National Bank,* 568 F.2d 911, 917 (2d Cir.1977). Indeed, because a major purpose behind our bankruptcy laws is to afford a debtor some breathing room from creditors, it is almost inevitable that creditors will, in some sense, be "frustrated" when their debtor files a bankruptcy petition. *See, e.g., In re Food Workshop, Inc.,* 70 B.R. 962, 967 n. 3 (Bankr.S.D.N.Y.1987). In reality, there is "a considerable gap between delaying creditors, even secured

creditors, on the eve of foreclosure and the concept of abuse of judicial purpose." *Collier* § 1112.03, at 1112-33. <u>Matter of Cohoes Indus. Terminal, Inc.</u> 931 F.2d 222, 228 (C.A.2 (N.Y.),1991)

Notwithstanding the protections afforded by 11 U.S.C. §362(a), the automatic stay can be lifted, on notice and a hearing "for cause".

11 U.S.C. § 362(d) of the Code provides as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
> (A) the debtor does not have equity in such property; and
> (B) such property is not necessary to an effective reorganization;
> …..

In the case at bar, the only "cause" set forth in the Motion is the extensive investment made in St. Casimir by Alliant. For the reasons set forth above, all such arguments are unavailing and do not warrant relief from the automatic stay at this time. The Court, in <u>In re Pegasus Agency, Inc.</u>, 101 F.3d 882 (2d Cir.,1996) stated the standards for lifting the automatic stay:

> As noted, two factors must be satisfied to continue the automatic stay as a bar to foreclosure on a debtor's property. First, under Section 362(d)(2)(A), the debtor must have residual equity in the property. The parties agree that this requirement is not fulfilled because the amount Pegasus owes on its mortgage is greater than the value of the Davenport Property. Second,

under Section 362(d)(2)(B), the debtor must show that the property at issue is "necessary to an effective reorganization." § 362(d)(2)(B); *Timbers of Inwood Forest,* 484 U.S. at 375, 108 S.Ct. at 632-33 (debtor's burden). To demonstrate "necessity," Pegasus had to show that "the property is essential for an effective reorganization that is in prospect" and that there is a "reasonable possibility of a successful reorganization within a reasonable time." *Timbers of Inwood Forest,* 484 U.S. at 376, 108 S.Ct. at 633 (citation and internal quotation marks omitted). In re Pegasus Agency, Inc. 101 F.3d 882, 886 (2d Cir.,1996).

The Court did not engage in the analysis called for in the District Court Reported Decision, Schick, Id. and Adelphia, Id. in order to determine if the Partnership Agreement, (CD-A-2), Exhibit "A", indeed could be assumed by the debtor-in-possession, thus providing "for the reasonable possibility of a successful reorganization within a reasonable time", United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd. 484 U.S. 365, 376, 108 S.Ct. 626, 633 (U.S. 1988).

If such reorganization is in prospect, even if the Debtor lacks equity in St. Casimir, the lifting of the automatic stay was erroneous. The record establishes that the Debtor indeed does have equity in the Partnership. See, e.g. Affidavit of Gary Flocco, (D-2a). As per the Partnership Agreement (CD-A2, Exhibit "A"), Alliant's interest in the Residence phases out in 2013 when its right to use the tax credits associated with the Residence run out. The Yonkers IDA's interest in the property ceases after the mortgage is paid (2040 if not paid earlier), when the St. Casimir has the right to purchase same for one dollar ($1.00) (D-2a). Thus, the Debtor's interest will be quite valuable.

## **CONCLUSION**

Accordingly, this Court should reverse the Bankruptcy Court's order

determination that Appellee was entitled to termination of the automatic stay.


Dated: June 8, 2007
        Harrison, New York


                        Respectfully Submitted,

                        RATTET, PASTERNAK & GORDON OLIVER, LLP
                        Attorneys for the Debtor
                        550 Mamaroneck Avenue
                        Harrison, New York 10528
                        (914) 381-7400


                            /S/
                        By: James B. Glucksman (5722)